GULOTTA, Judge,
dissenting.
I respectfully dissent.
Because I conclude from the undisputed facts that Benjamin was contributorily negligent, I would reverse the trial court’s judgment. Assuming that the tilted tailgate resulted from the negligence of one or more of the defendants and was causally related to the plaintiff’s injuries, the undisputed testimony of plaintiff and his coworkers leads me to conclude that Benjamin’s injury resulted from his negligence.
The record indicates that plaintiff and the crane operator were aware of the tilted tailgate before unloading the car. Jessie Bourn, the crane operator, testified that when he first went out to the work site that morning he had seen the tailgate of the car lying on one of the longer beams at the bottom of the car. He further indicated that he could have raised the tilted gate to a vertical position and wired it back in place, but that he did not think it was necessary since the beam “wouldn’t have scraped that bad” and the abundance of room at the other end of the car would allow an experienced man in the car to hook up the beam and get it out “without any problem.” His belief that the tilted gate would not present any problem is evidenced by the safe removal of three beams from the car by Benjamin prior to the accident and the uneventful removal of the remainder of the carload after the accident while the gate remained in a tilted position.
Bourn further stated that after the accident he saw that all the beams were neatly stacked and that there was no problem with “shifting”. Benjamin himself testified that he had noticed the tailgate of the car was tilted and had a piece of wire on it before he began unloading the car. Although he mentioned the condition to the foreman, he did not ask the crane operator to straighten the gate.
Alexander T. Asprodites, president of Victory Iron Works, testified that Benjamin “knows how to hook up a beam and take it out of the car.” Plaintiff himself stated that he had experience unloading steel beams, apparently without incident, while working on the riverfront. In light of this testimony, the only logical inference to be drawn is that, under ordinary circumstances, the tilted tailgate would not create any hazard to an experienced worker placing the clamps on the beams inside the car.
According to Benjamin, after a beam was clamped in the middle, the crane operator would be signalled to elevate it approximately one or one-and-one-half feet. If the beam balanced, Benjamin would then move to a secure place, and signal the operator to elevate it out of the car. Benjamin testified that after the “dogs” had been placed on the forty-foot beam in question and it had “balanced” after being elevated, it began to slide toward the tilted tailgate. Significantly, he testified that the gate had not been leaning on the beam when he had first tried to pick it up, but that the beam was “just up under the edge of the gate” and “slid back maybe a foot, a foot-and-a-half.” He further indicated that the beam had been “already under the edge of the gate and it slipped back further.” It is also significant that the crane operator testified that nothing in the car could have kept Benjamin from looking at both ends of the beam or seeing that the tailgate was in a tilted position.
In light of Benjamin’s testimony and the other evidence indicating that the tilted tailgate would not hinder removal even of the long beam on which it was resting, the only logical inference is that Benjamin himself was contributorily negligent either in improperly clamping the beam such that it slid under the tailgate, or in signalling the crane operator to lift the beam when its end was “just up under the edge of the gate.”